LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
JOSHUA L. CROWELL (#295411)
LESLEY F. PORTNOY (#304851)
JENNIFER LEINBACH (#281404)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: jcrowell@glancylaw.com

*Attorneys for Lead Plaintiffs Michael Hamblett and Robert Shavelle*

[Additional counsel on signature page.]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

ROBERT COWAN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

GOLDCORP, INC., *et al.*,

Defendants.

Case No. CV 16-6391 FMO (AFMx)

**CLASS ACTION**

**CORRECTED FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

The Hon. Fernando M. Olguin

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1

II. JURISDICTION AND VENUE .......... 3

III. PARTIES .......... 4

A. Plaintiffs .......... 4

B. Defendants .......... 4

IV. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .......... 7

A. Goldcorp's Business and the Peñasquito Mine .......... 7

B. Peñasquito's Land and Water Needs .......... 8

C. Peñasquito's Tailings Facility .......... 9

D. Mexico's Environmental Regulatory System .......... 10

E. Goldcorp's Environmental and Sustainability Policy .......... 11

F. History of Regulatory Violations at the Peñasquito Mine .......... 13

G. The Selenium Leaks at the Peñasquito Mine .......... 14

1. The Danger of Selenium Leaks .......... 14

2. Discovery of the Selenium Leaks .......... 15

3. Selenium Levels Continue to Rise; Reporting Issue to Mexican Government .......... 16

4. Reuters Investigation; Goldcorp's Meeting with Regulators .......... 17

V. THE TRUTH EMERGES .......... 18

A. The Selenium Leaks and Mexican Regulators' Investigation Are Publicly Revealed for the First Time ..... 18

B. Community Outrage Ensues ..... 22

C. The Blockade and Controlled Shutdown of the Peñasquito Mine ..... 25

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 26

A. 2013 Annual Report ..... 26

B. 2014 First Quarter Report ..... 27

C. 2014 Second Quarter Report ..... 28

D. 2014 Denver Gold Forum ..... 29

E. 2014 Third Quarter Report ..... 30

F. 2014 Annual Report ..... 31

G. 2015 First Quarter Report ..... 32

H. 2015 Second Quarter Report ..... 33

I. 2015 Third Quarter Report ..... 34

J. 2015 Annual Report ..... 35

VII. LOSS CAUSATION ..... 36

VIII. PRESUMPTION OF RELIANCE ..... 37

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..... 39

X. CLASS ACTION ALLEGATIONS ..... 40

XI. CLAIMS FOR RELIEF ..... 42

XII. PRAYER FOR RELIEF .......... 46

XIII. JURY DEMAND .......... 46

Lead Plaintiffs Michael Hamblett and Robert Shavelle ("Plaintiffs" or "Lead Plaintiffs"), by and through their counsel, individually and on behalf of all others similarly situated, for their First Amended Complaint for Violations of Federal Securities Laws (the "Complaint") against Defendants Goldcorp, Inc. ("Goldcorp" or the "Company"), former Chief Executive Officer ("CEO") and President Charles A. Jeannes ("Jeannes"), former Chief Financial Officer ("CFO") Lindsay A. Hall ("Hall"), current CEO and President David A. Garofalo ("Garofalo"), and current CFO Russell D. Ball ("Ball") (collectively, "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, conversations with potential witnesses, a review of Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Goldcorp, analysts' reports and advisories about Goldcorp, and other publicly available information.

## I. PRELIMINARY STATEMENT

1. This is a federal securities class action brought by Lead Plaintiffs on behalf of a class consisting of persons and entities that purchased or otherwise acquired Goldcorp securities during the period of March 31, 2014 through October 3, 2016 (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. This action arises out of Defendants' material misrepresentations and omissions and fraudulent course of conduct surrounding Goldcorp's mining operations at its Peñasquito mine. Located in Zacatecas, Mexico, the Peñasquito mine is the largest gold producer in Mexico and one of the largest in the world, accounting for approximately one-third of the Company's sales in 2015.

3. Throughout the Class Period, Goldcorp portrayed itself as a good corporate citizen with a responsible approach to mining. The Company touted its environmental sustainability policies and practices, its compliance with environmental rules and regulations, and its proactive communications with surrounding communities. Among other things, Goldcorp represented to the investing public that: (i) it took "appropriate steps . . . to prevent discharges of pollutants into the ground water and the environment"; (ii) its "mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations"; (iii) it has "rigorous control of tailings management"; and (iv) it would "[p]romote the development and implementation of effective systems to minimize risks to health, safety and the environment."

4. Despite these affirmative statements, Goldcorp has, for years, concealed from the investing public and the community surrounding the Peñasquito mine that its "tailings dam" – a facility containing the toxic waste produced by mining operations – was leaking selenium into the groundwater surrounding the mine. Exposure to high levels of selenium may lead to dizziness, fatigue, irritation of the digestive tract and – in extreme cases – may lead to collection of fluid in the lungs and bronchitis. Ingestion of elevated levels of selenium over long periods of time may lead to effects such as brittle hair, deformed nails, tooth decay, irritation of the digestive tract, fatigue, depression and loss of feeling in the arms and legs. Selenium is also harmful to the environment, including animals and agriculture.

5. As revealed in an article published by Reuters on August 24, 2016 (the "Reuters Report"), Defendants knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was

unable to contain the problem; and (iv) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

6. When the Reuters Report was published on August 24, 2016, investors learned of the selenium leaks at the Peñasquito mine, Goldcorp's ongoing efforts to contain them, and the Mexican government's investigation of the Company's potential violations of environmental rules and regulations. In response, on August 24, 2016, the Company's stock price fell $1.64 per share, or approximately 9% from its previous closing price, to close at $16.05 per share. This stock drop caused significant harm to Goldcorp investors.

7. After the explosive revelations of the Reuters Report, the communities surrounding the Peñasquito mine were outraged. In part motivated by the environmental contamination, contractors and landowners engaged in a blockade of the mine, eventually causing Goldcorp to conduct a controlled shut-down of operations. The shut-down lasted approximately one week, demonstrating the potential consequences of Goldcorp's conduct. In response to news of the shut-down, the Company's stock price fell even further, causing additional damages to investors.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Section 10(b) and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a significant portion of Defendants' actions, and the subsequent damages, took place within this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

12. Lead Plaintiff Michael Hamblett purchased or otherwise acquired Goldcorp common stock during the Class Period, as set forth in the certification previously filed with the Court (ECF No. 20-2), and suffered damages as a result of the federal securities law violations alleged herein. By order dated November 21, 2016, the Court appointed Mr. Hamblett as one of the Lead Plaintiffs in this action.

13. Lead Plaintiff Robert Shavelle purchased or otherwise acquired Goldcorp common stock during the Class Period, as set forth in the certification previously filed with the Court (ECF No. 20-2), and suffered damages as a result of the federal securities law violations alleged herein. By order dated November 21, 2016, the Court appointed Mr. Shavelle as one of the Lead Plaintiffs in this action.

14. Plaintiff City of Bristol Pension Fund purchased or otherwise acquired Goldcorp common stock during the Class Period, as set forth in the certification previously filed with the Court (ECF Nos. 17-2, 17-3), and suffered damages as a result of the federal securities law violations alleged herein.

### B. Defendants

15. Defendant Goldcorp engages in the acquisition, exploration, development, and operation of precious metal properties in Canada, the United States, Mexico, and Central and South America. The Company is incorporated in Ontario, Canada with principal executive offices located at 666 Burrard Street, Suite 3400, Vancouver, British Columbia, V6C 2X8 Canada. Goldcorp common shares are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GG."

16. Defendant Jeannes served as the CEO and President of Goldcorp from January 1, 2009 through February 29, 2016. He had previously been Executive Vice President ("EVP") of Corporate Development from November 2006 until December 2008. From 1999 until Goldcorp's acquisition of Glamis Gold Ltd. in 2006, Jeannes was EVP of Administration, General Counsel, and Secretary of Glamis. Before joining Glamis, he worked for Placer Dome Inc. as Vice President ("VP") of Placer Dome North America.

17. Jeannes made several false and misleading statements and omissions throughout the Class Period as a signatory of Goldcorp's annual financial reports and during investor conferences.

18. Defendant Hall served as CFO of Goldcorp from April 19, 2006 through March 9, 2016 and also served as EVP from March 3, 2006 through March 9, 2016. Before joining Goldcorp, he had been the CFO and EVP of Placer Dome Inc. since November 1, 2005.

19. Hall made several false and misleading statements and omissions throughout the Class Period as a signatory of Goldcorp's annual and quarterly financial reports.

20. Defendant Garofalo has been the President and CEO of Goldcorp since February 29, 2016. Before joining Goldcorp, he had been President, CEO, and Director of Hudbay since July 2010. Before Hudbay, Garofalo served as Senior Vice President ("SVP") of Finance and CFO of Agnico-Eagle Mines Limited from 1998 to 2010.

21. Garofalo made several false and misleading statements and omissions throughout the Class Period as a signatory of Goldcorp's annual financial reports.

22. Defendant Ball has been CFO and EVP of Corporate Development of Goldcorp since March 9, 2016. He joined Goldcorp in May 2013 as EVP of Capital Management, and in December 2014, he was appointed EVP of Corporate Development and Capital Projects. Before joining Goldcorp, Ball served as EVP and CFO of Newmont Mining Corporation

23. Ball made several false and misleading statements and omissions throughout the Class Period as a signatory of Goldcorp's annual and quarterly financial reports.

24. Defendants Jeannes, Hall, Garofalo, and Ball are also referred to herein as the "Individual Defendants."

25. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of, or with deliberate recklessness disregarded, the fact that materially false and misleading statements were being made concerning the Company; and/or

g. approved or ratified these materially false and misleading statements in violation of the federal securities laws.

26. Goldcorp is liable for the acts of the Individual Defendants and the Company's other employees and/or agents under the doctrine of *respondeat superior* and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of any such employees' employment responsibilities and obligations.

27. The scienter of the Individual Defendants and the Company's other employees and/or agents is similarly imputed to Goldcorp under *respondeat superior* and agency principles.

## IV. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A. Goldcorp's Business and the Peñasquito Mine

28. Goldcorp is a leading gold producer engaged in the operation, exploration, development, and acquisition of precious metal properties in Canada, the United States, Mexico, and Central and South America. The Company generates cash flow primarily from the sale of gold, but also silver, copper, lead, and zinc.

29. Based on 2015 production, Goldcorp's largest mines are Peñasquito (Mexico), Pueblo Viejo (Dominican Republic), Red Lake (Ontario), Porcupine (Ontario), Musselwhite (Ontario), Los Filos (Mexico), and Eleonore (Quebec).

30. Located in the State of Zacatecas, in north-central Mexico, the Peñasquito mine is the largest gold producer in Mexico and one of the largest in the world. Producing 860,300 ounces of gold in 2015, Peñasquito accounted for approximately one-quarter of Goldcorp's total output and one-third of its sales that year. Peñasquito is the Company's largest operation, its flagship mine, the main driver of the Company's gold production and growth.

31. Acquired by Goldcorp through the acquisition of Glamis Gold Ltd. in 2006, the Peñasquito mine is wholly owned by Goldcorp through its subsidiary, Minera Peñasquito. Goldcorp commenced construction at Peñasquito in 2007; mining operations began in or about October 2009; and commercial production was declared in or about September 2010. The mine has two separate process facilities, an oxide ore facility and a plant to process sulfide ore.

32. The Peñasquito mine consists of two open pits – Peñasco and Chile Colorado – containing gold, silver, lead and zinc. Mine production is distributed across gold, silver, and other base metals, with 2015 metal revenue proportions of approximately 56.5% for gold, 18% for silver, 17.5% for zinc, and 8% for lead. The

mine produced 403,800 ounces of gold in 2013; 567,800 ounces in 2014; and 860,300 ounces in 2015. The combined mine sites have the most proven and probable reserves of any Goldcorp mining operation.

**B. Peñasquito's Land and Water Needs**

33. The land upon which the Peñasquito mine sits is held by Mexican farming communities as communal lands known as "ejido." Goldcorp has entered into temporary occupation agreements ranging from five to thirty years with the ejido communities to occupy the mining lands. During the Class Period, Goldcorp was engaged in litigation with the ejido communities over pending land claims related to these occupation agreements in the Mexican agrarian court.

34. Mining operations at Peñasquito require enormous amounts of water to extract the desired materials from the earth. Water is also used for tailings storage and processing. The mine obtains its potable water from the Torres-Vergel well field located six kilometers away.

35. In 2015, Goldcorp reported that its Peñasquito mining operations significantly affected groundwater sources. "Significant" is defined as withdrawals that account for 5% or more of the annual average volume of a given body of water. Peñasquito mine is located in an arid environment and, to compensate for water losses, the Company looked to adding water from groundwater supply wells. It located an additional ground water source in its Northern Well Field, which is approximately 60 kilometers northwest of the mine.

36. Also in 2015, Goldcorp planned to commence its construction operations to access the Northern Well Field groundwater source, but due to community protests and a blockade, the Company was unable to begin construction as planned. Specifically, the ejido community was concerned with the construction because Goldcorp's use of the area's groundwater sources had substantially depleted aquifer levels, leaving the ejido farmers with insufficient water for their crops.

### C. Peñasquito's Tailings Facility

37. As a *Vancouver Sun* article titled, "How tailings dams work," published on August 12, 2014, explained:

> Metals mines use a tremendous amount of water in the process of grinding up and separating minerals from ore, and leave behind waste rock that has been reduced to the consistency of sand, which is referred to as tailings and deposited into tailings ponds. "Ponds" can wind up being massive structures more like lakes, square-kilometres in size and held in place by earth-filled dams that, in mountainous valleys, can reach as high as 300 metres.
>
> * * * *
>
> A tailings dam is the physical structure that holds in, or impounds, the tailings pond, which serves the dual role of containing the ground-rock tailings from the ore-milling and separation process and recycling the water to be reused in processing. McLeod said tailings are piped out in a slurry form to the pond, where solids settle to the bottom and the water on top is pumped via a reclamation barge back into the mill.

38. Tailings are waste materials created by the mining process that are often hazardous to the environment and human health. Gold mining operations produce varied kinds of waste, much of it toxic, which pose various challenges for long-term containment. A tailings dam, which results in a tailings pond, are designed for permanent containment of the toxic waste, meant to remain there forever.

39. Before the mine operations began at Peñasquito, Goldcorp performed geotechnical field investigations to support the design of the process plant and waste facility. The waste facility is referred to as a "tailings impoundment," "tailings facility," or "tailings storage facility."

40. Goldcorp prepared a "Peñasquito Project Technical Report," dated August 2007, which was filed with the SEC. Under the heading "Tailings Design," the report stated:

> ***The tailings impoundment is designed as a zero discharge facility*** with the capacity to store temporarily excess water from mill operations and expected climatic events including the design storm. Water will be reclaimed as needed from the tailings facility for use in the mill. The base of the dam and impoundment will rest on native alluvial soils including layers of caliche, silty sand and gravel, sandy silt and sandy clay. Fine tailings will be placed over the alluvial soils to reduce the potential for downward seepage from the tailings pool.

> The starter dam will be constructed as an earthfill structure using Peñasco Pit overburden materials. The dam will be raised in a centerline or downstream configuration using cyclone underflow sand tailings. Underdrains will be placed to collect seepage from the sand placement operations and direct it to a seepage collection pond.
>
> * * * *
>
> ***Monitoring wells will be provided downstream from the dam seepage pond.***

(Emphasis added.)

**D. Mexico's Environmental Regulatory System**

41. Mexican environmental law stems from Federal, state, and municipal rules and regulations. There are various administrative agencies responsible for regulating and enforcing environmental laws.

42. These administrative authorities are responsible for setting forth the technical standards known as Mexican Official Norms ("NOMs"). NOMs set out binding specifications, standards, values, and characteristics applicable to different facilities, activities, or methods of production. NOMs also set out maximum allowable pollutant limits for containments in air, water, and soil.

43. The Secretariat of the Environmental and Natural Resources (Secretaria de Medio Ambiente y Recursos Naturales, or "SEMARNAT") is the main governmental agency in charge of enacting and enforcing environmental regulation at the federal level.

44. There are various administrative agencies associated with SEMARNAT that oversee specific areas of environmental policy. Those agencies include the National Water Commission (Comision Nacional del Agua or "Conagua") and the Office of the Federal Prosecutor for Environmental Protection (Procuraduria Federal de Proteccion al Ambiente or "PROFEPA").

45. PROFEPA is the enforcement arm of SEMARNAT and has the authority to carry out a number of duties including: (1) conduct inspection visits; (2) prosecute environmental non-compliance; (3) apply sanctions; (4) enforce environmental laws

and regulations; and (5) perform inspections and issue sanctions for violations of climate change law.

46. Under Mexican law, sources of emissions subject to federal regulation must obtain an Integrated Environmental License ("LAU"), which is a single permitting procedure for environmental impact and risk, air emissions, hazardous waste, and water. In addition to LAU, certain operations may need other permits not covered by the LAU. Some local environmental permits, for example, must be obtained separately. The penalties for non-compliance with LAU and related environmental laws vary. Sanctions can include: (1) fines; (2) closure of non-complying facility; (3) administrative arrest; and (4) revocation of permitted authority.

47. Water pollution is regulated by the National Waters Law (Ley de Auguas Nacionales or "LAN"). LAN regulates the extraction of federal underground or surface waters, discharge of residual waste recipient bodies, and federal property under Conagua's "Comision Nacional del Agua" ("CNA").

48. If there is an unauthorized discharge of contaminants into a recipient body exceeding permitted level, CNA and PROFEPA must be immediately notified. PROFEPA and CNA determine the measures, including clean-up, that the non-complying party will be responsible for as a result of the unauthorized discharge. Non-compliance with LAN can result in various sanctions including: (1) fines; (2) closure of water wells or facilities extracting water; and (3) revocation of a concession authorization or waste water discharge permit.

49. Air pollution is also regulated by the LAU permit and SEMARNAT. Air emissions cannot exceed the limits set out in the NOMs. If emissions exceed the statutory limit, the responsible party is subject to the LAU penalties outlined above.

**E. Goldcorp's Environmental and Sustainability Policy**

50. In its 2013 annual report filed with the SEC on Form 40-F, Goldcorp represented that it "has implemented an environmental and sustainability policy" (the "Sustainability Policy"). The policy states that "[Goldcorp] and its subsidiaries are

committed to the protection of life, health and the environment for present and future generations. Resources will be focused to achieve shareholder profitability in all operations without neglecting Goldcorp's commitment to sustainable development. The needs and culture of the local communities will be respected."

51. To implement Sustainability Policy, Goldcorp represented that it would commit the necessary resources to:

- ***Design, construct, operate and close the Corporation's facilities to comply with applicable local regulations and laws and to meet international guidelines.***
- Promote employee commitment and accountability to the Environmental and Sustainability Policy and enhance employees' capabilities in the implementation through the use of integrated management systems.
- ***Promote the development and implementation of effective systems to minimize risks to health, safety and the environment.***
- Be proactive in community development programs so the communities are not reliant on the mines for their future.
- ***Communicate openly with employees, local stakeholders and governments on the Corporation's plans, programs and performance.***
- Work cooperatively with government agencies, local communities, educational institutions and suppliers to achieve safe handling, use and disposal of all of the Corporation's materials, resources and products.
- ***Use the best technologies to continuously improve the safe, efficient use of resources, processes and materials.***

(Emphasis added.)

52. In addition, during 2013, Goldcorp developed the Sustainability Excellence Management System ("SEMS"), a performance-based framework and standards for safety and health, environment, corporate social responsibility, and security. According to the Company, "SEMS is intended to be fully integrated into all core business functions throughout the Corporation, and the Corporation expects that it will emphasize sustainability, responsibility and accountability at all organizational levels." SEMS was fully implemented in 2014.

53. A committee of Goldcorp's Board of Directors, the Sustainability, Environment, Health, and Safety Committee, is charged with overseeing the Sustainability Policy. The committee is responsible for reporting environmental risks, and changes thereto, on a quarterly basis, to the Board.

54. Further, Goldcorp's Sustainability Policy provides that "[the Company's] properties are routinely inspected by regulatory staff to ensure that such properties are in compliance with applicable environmental laws and regulations." Properties are also "periodically audited by internal staff to ensure that such properties are in compliance with applicable environmental laws and regulations as well as [the Sustainability Policy] and standards."

55. Specifically with respect to water resources, Goldcorp's Sustainability Policy provides that:

> ***Goldcorp's use of water resources can have a potentially significant environmental impact if they are not designed and managed well*** and, as such, efficient water management is a priority at all of Goldcorp's operations. Goldcorp has a particular focus on recycling process water. Other initiatives that Goldcorp has adopted include predictive water balance models, continuous improvement programs, and performance monitoring systems. ***Goldcorp monitors risks associated with water quality and quantity, and the potential impact on local communities.*** Recognizing the value of water as a shared resource, Goldcorp developed a corporate-wide Water Stewardship Strategy during 2013. The Water Stewardship Strategy includes specific milestones to be achieved at each of Goldcorp's operations, which include: ***designation of a person responsible for water stewardship at each operation, site-wide water audits***, hydrogeological modeling, a site-wide water balance, and basin scale water footprint characterization. Implementation of the Water Stewardship Strategy is currently underway.

(Emphasis added.)

**F. History of Regulatory Violations at the Peñasquito Mine**

56. In 2013, Mexican environmental authorities imposed a monetary fine on Goldcorp for non-compliance with air emissions standards and requirements at the Peñasquito mine. Then, in 2014, Goldcorp paid a total of approximately $250,000 in environmental fines levied at Peñasquito.

57. As PROFEPA revealed after the Class Period, since 2013, the regulatory agency has initiated and completed five administrative proceedings against Goldcorp. Villagers who live near the Peñasquito mine have submitted at least two complaints to environmental authorities about seepage from the wall of the tailings dam.

### G. The Selenium Leaks at the Peñasquito Mine

#### 1. The Danger of Selenium Leaks

58. A mine generates large amounts of highly concentrated wastewater due to contact between water and various types of minerals. The major waste product of mining is mine tailings, made up of chemically treated ore as well as waste rock. When the ore-containing material is processed, it is ground up to a very small particle size and then chemical additives are used to remove the desired material. The desired material is usually a small percentage of the material that is processed, so a great deal of waste is produced. Tailings are the solid material and waste water that remain after metals and minerals have been extracted from mined ore. Tailings are most commonly stored in surface ponds that are dammed due to their high liquid content.

59. Tailings from gold mining operations can pose a threat to the environment and health of nearby communities. This waste can be harmful if it leaches into groundwater. Gold often must be extracted from sulfide ore. Due to inefficiencies in the extraction process, large volumes of sulfides often end up going into the tailings. The element selenium is found in metal sulfide ores. Selenium is sometimes released into the environment by mining and can be present in waste stored in tailings ponds. In sufficiently high concentrations, selenium is an environmental contaminant and can cause deformities in wildlife.

60. The Peñasquito tailings impoundment is purportedly a zero discharge facility, meaning there should be no discharge of wastewater. The tailings impoundment stores excess water temporarily from mill operations and expected climatic events. Water is reclaimed as needed from the tailings facility for use in the mill.

61. Goldcorp monitored potential leaks through so-called monitoring wells. These are wells dug within close proximity of the tailings dam for the purpose of detecting and monitoring poly-metallic substances and potential leaks.

62. Seepage of selenium into drinking water can be extremely harmful to humans. Exposure to high levels of selenium may lead to dizziness, fatigue, irritation of the digestive tract and in extreme cases may lead to collection of fluid in the lungs and bronchitis. Ingestion of elevated levels of selenium over long periods of time may lead to effects such as brittle hair, deformed nails, tooth decay, irritation of the digestive tract, fatigue, depression and loss of feeling in the arms and legs. Ingestion of extremely high levels of selenium compounds can be fatal.

63. Under Mexican regulations, maximum selenium levels are 0.008 milligrams per liter in fresh water bodies and 0.02 milligram per liter in water for agricultural use. As the Reuters Report would reveal, selenium levels in the groundwater at Peñasquito exceeded five times the maximum.

**2. Discovery of the Selenium Leaks**

64. According to the Reuters Report, as early as October 2013, Goldcorp observed that levels of selenium were rising in one of the groundwater monitoring wells at the Peñasquito mine. From October 2013 through the end of 2014, selenium levels continued to rise, reaching alarming levels.

65. Even before the start of the Class Period, Goldcorp was aware that selenium levels had potentially already exceeded the maximum allowable level. In Goldcorp's Technical Report for the "Peñasquito Polymetallic Operation," dated January 2014 and filed with the SEC, the authors note in multiple places that selenium was "potentially outside Mexican standards." For example, under the section titled "1.24 Waste Characterisation," the report states the following:

> Potentially acidforming waste (PAG) materials and rock types that have ML [metal leaching] potential are currently stored in the waste rock. ***The tailings materials have somewhat higher potential to produce ARD [acid rock drainage] and ML (selenium being the only metal potentially outside Mexican standards).*** Control of ARD and ML from tailings

> materials will be achieved through reclamation of the current tailings facility after its closure in 2017.

(Emphasis added.)

66. Selenium is a byproduct of the gold mining process, and after three years of operation, selenium in the groundwater suddenly spiked. As explained in greater detail below, the Reuters Report reveals that from October 2013 through March 2015, selenium concentrations in the groundwater increased from a level below Mexico's regulatory maximum to a level more than five times the maximum; thus, selenium concentrations increased at least 500% over an 18-month period. Subsequently, from April 2015 through August 2016, selenium concentrations began to fall and then leveled off. Such large fluctuations are not consistent with natural causes. Further, in light of the higher concentrations of selenium that were discovered by October 2013, by the start of the Class Period in March 2014, Goldcorp should have been able to confirm the existence of selenium leaks from the tailings dam.

67. Goldcorp's internal documents show that the Company was fully aware of the risks that the selenium leak posed. As set forth in the Reuters Report, an internal Goldcorp presentation dated September 2015, reviewed by Reuters, laid out the "key risks and opportunities" associated with the selenium leaks. One risk was that ***"community knowledge and understanding of potential groundwater contamination may raise national and international attention."*** The presentation also warned of the risk of ***"long term impacts to human health and the environment if the plume is not adequately mitigated."***

### 3. Selenium Levels Continue to Rise; Reporting Issue to Mexican Government

68. Based on a review of internal Goldcorp documents and data and interviews with government officials, the Reuters Report provides the following timeline regarding selenium levels at Peñasquito:

a. As early as October 2013, Goldcorp observed that levels of selenium were rising in one of the groundwater monitoring wells.

b. From October 2013 through March 2015, the selenium levels continued to rise and the contamination around the tailings dam intensified.

c. Under Mexican regulations, maximum selenium levels are 0.008 milligrams per liter in fresh water bodies and 0.02 milligrams per liter in water for agricultural use. Selenium levels at Peñasquito rose to more than five times the maximum.

d. In April 2015, selenium levels began to fall.

e. From September 2015 through January 2016, selenium levels remained at around 0.01 milligrams per liter.

69. According to the Reuters Report, in October 2014, Goldcorp informed Mexican regulators that it was observing rising selenium and sulphate levels in two groundwater wells.

70. The fact that Goldcorp – unprompted – notified Mexican environmental regulators of the selenium issue in October 2014 suggests that the Company was absolutely certain at this time that selenium levels were well past maximum levels.

71. In addition, Goldcorp's Sustainability, Environment, Health, and Safety Committee visited the Peñasquito mine in October 2015.

**4. Reuters Investigation; Goldcorp's Meeting with Regulators**

72. In or about July or August 2016, reporters from Reuters contacted Goldcorp about an upcoming story, asking questions about selenium leaks at the Peñasquito mine.

73. After Reuters contacted the Company but approximately two weeks before the Reuters Report was published, representatives of Goldcorp met with Mexican environmental regulators in the City of Zacatecas. During this meeting, Goldcorp informed regulators that the problem had spread: contaminated water and leaks had been found in other areas of property around the tailings dam. As the Reuters Report would later reveal: "Goldcorp described leaks in three other areas to the west and south of the facility, in addition to the original well. The company's presentation, seen by

Reuters, showed that two of the leaks were just to the north of Las Mesas, a community of about 90 families who mostly raise cattle or grow corn and beans."

74. Also during this August 2016 meeting with regulators, Goldcorp reported that, to address the leaks, it was taking the following actions: (i) relocating a pond that reclaims water from mine tailings, a project that should be completed in 2017; and (ii) building trenches due to possible leaks to the south of the tailings dam.

75. As reflected in the Reuters Report, Goldcorp represented to Reuters that so far there was no evidence that the leaks at Peñasquito had endangered public health or caused environmental damage or that the contamination spread beyond Goldcorp's property lines. Mexican regulators did not dispute this contention in the media.

76. However, it is clear that Mexican regulators had not been paying close attention to the selenium leak at Peñasquito. It was only after Reuters posed questions in August 2016 that regulators were informed about the additional leaks and areas of contamination. Moreover, as the Reuters Report stated, Conagua did not even conduct its own tests of water quality around the mine in response to the leak. Only after receiving questions from Reuters did Conagua announce that at least two new wells would be built near the mine to monitor water quality. And, as alleged below, the community surrounding Peñasquito has serious doubts about the regulators' vigilance on this issue to date.

## V. THE TRUTH EMERGES

### A. The Selenium Leaks and Mexican Regulators' Investigation Are Publicly Revealed for the First Time

77. On August 24, 2016, the Reuters Report is published. In the report, PROFEPA and Conagua disclosed that "they are examining whether [Goldcorp] broke any regulations in its handling of a long-running leak of contaminated water at [Peñasquito mine]." PROFEPA also stated that it was investigating whether Goldcorp had "downplayed or not fully disclosed relevant information." According to Reuters, the leak had not been previously disclosed to the public.

78. The Reuters Report reads in full:

TOP NEWS | Wed Aug 24, 2016 | 12:13pm EDT

**Exclusive: Goldcorp struggles with leak at Mexican mine | Reuters**

*By Allison Martell, Frank Jack Daniel and Noe Torres | TORONTO/MEXICO CITY*

Mexican regulators said they are examining whether mining company Goldcorp Inc (G.TO) broke any regulations in its handling of a long-running leak of contaminated water at Mexico's biggest gold mine.

The move follows questions from Reuters about the leak, which until now has not been disclosed to the public.

Levels of the mineral selenium rose in one groundwater monitoring well near Goldcorp's Penasquito mine as early as October 2013, Goldcorp data reviewed by Reuters shows.

The Canadian company reported a rise in selenium levels in groundwater to the Mexican government in October 2014, after which the contamination near its mine waste facility intensified, according to internal company documents seen by Reuters, and interviews with government officials. Two weeks ago, the company told Mexican regulators that contaminated water had also been found in other areas of its property.

There is no evidence that the leaks at the mine have endangered public health or caused environmental damage, Goldcorp and regulators say.

Goldcorp said it has not informed villagers living near the mine because its tests showed the leak had not affected groundwater beyond its property line or contaminated the local drinking water.

The company was not legally required to tell the community, Mexican regulators said. The head of the industrial inspection unit at Mexico's environmental prosecutor Profepa, Arturo Rodriguez Abitia, said it would have been preferable for Goldcorp to inform the local community about the leaks, but that it was not obliged to do so if the problem had not spread beyond its boundaries.

The company said its monitoring program worked as intended and helped quickly identify the problem at the mine, which lies in a semi-desert region of the northern state of Zacatecas and which in 2015 produced 860,300 ounces of gold, a quarter of Goldcorp's total production.

"We have managed the issue within the confines of our property and continue to monitor and operate our tailings management system to prevent any external impacts," Goldcorp said when asked when the leak was discovered and whether it was ongoing.

Selenium is sometimes released into the environment by mining and can be present in waste stored in what are known as tailings ponds. High concentrations in water can damage human health and cause deformities

in wildlife. In recent years its effect on fish and waterbirds has led to successful lawsuits against North American miners including U.S.-based Patriot Coal, which filed for bankruptcy in 2012 under $443 million of selenium water treatment liabilities.

Vancouver-based Goldcorp declined to disclose how much it was spending to monitor and fix the leak, saying only that there was a "sufficient allocation of resources."

"This issue is one that we have taken seriously and we are taking the necessary measures to resolve," said Michael Harvey, the miner's Latin America director for corporate affairs and security.

Two weeks ago, after receiving questions from Reuters, Goldcorp met with Mexican regulators in Zacatecas. A presentation dated March 2016 but delivered at that meeting said one of the steps the company was taking to address the leak was to relocate a pond that reclaims water from the tailings. The company told Reuters that project should be completed next year.

HIGH SELENIUM LEVELS

Selenium levels in the well rose for months after the miner alerted authorities in October 2014, the company data seen by Reuters shows. The concentration began falling in April 2015 and from September at least through January it was steady at 0.01 mg/liter.

Canadian province British Columbia, where Goldcorp is headquartered, and Mexico both establish maximum selenium concentrations of 0.01 mg per liter in drinking water. Mexico sets maximum concentrations of 0.008 mg/l in fresh water bodies and 0.02 mg/l in water for agricultural use.

Levels in the groundwater at Penasquito rose to more than five times that level, the data shows.

A September 2015 internal Goldcorp presentation -- which was released onto the Internet by unidentified hackers earlier this year -- laid out "key risks and opportunities" associated with the spill. One risk, according to the presentation, was that "community knowledge and understanding of potential groundwater contamination may raise national and international attention."

The presentation also warned of the risk of "long term impacts to human health and the environment if the plume is not adequately mitigated."

Profepa's Rodriguez told Reuters his unit was examining the case to see whether Goldcorp had downplayed or not fully disclosed relevant information. He did not specify which regulations Goldcorp could have violated.

Goldcorp says it has complied with all Mexican requirements for notifying regulatory authorities.

Mexico's Conagua water regulator did not conduct its own tests of water quality around the mine in response to the leak, but said its regular

> monitoring of the aquifer through its own network of pumping stations had not shown a change in water quality. After receiving questions from Reuters, the regulator said at least two new wells would be built near the mine to monitor water quality.
>
> Villagers in the area around the mine have previously made at least two complaints to environmental authorities about alleged seepage from the wall of the tailings dam. Inspectors from the state unit of Profepa reported that there was nothing out of the ordinary in both cases.
>
> At the meeting with Profepa two weeks ago, Goldcorp described leaks in three other areas to the west and south of the facility, in addition to the original well. The company's presentation, seen by Reuters, showed that two of the leaks were just to the north of Las Mesas, a community of about 90 families who mostly raise cattle or grow corn and beans. Authorities in Las Mesas could not be reached for comment.

79. In response to the explosive revelations in the Reuters Report, the market pushed down the value of Goldcorp stock. On August 24, 2016, the Company's stock price fell $1.64 per share, or approximately 9% from its previous closing price, to close at $16.05 per share.

80. On August 25, 2016, PROFEPA publicly confirmed that in addition to investigating the rise in selenium levels, it was also investigating possible violations in Goldcorp's disposal of dangerous material and atmospheric emissions. Its investigation will "probably" be completed by the end of 2016. PROFEPA also stated that it was working with Conagua in monitoring the situation.

81. Securities analysts readily grasped the risk hanging over Goldcorp in light of these revelations. On September 5, 2016, BMO Capital Markets issued an analyst report on Goldcorp, stating that:

> **What Next?** $3B in year-end impairments, the "kitchen sinking" of production guidance following Mr. Garofalo's assuming control, and a bad Q2 has left investors asking "what next?". ***There is a view amongst investors that there are more issues that have yet to surface. Reports of potential selenium ground water contamination at Peñasquito feed into this view.***

(Emphasis added.)

82. And on September 7, 2016, National Bank Financial, in an analyst report initiating coverage of Goldcorp, stated that:

> **Recent reports of a selenium leak at Peñasquito.** Though Goldcorp has had constant dialogue with the regulatory authorities since it was first reported in 2014, recent reports suggest Mexican regulators are now examining whether Goldcorp violated regulations in its handling of a long-running leak of contaminated water at Peñasquito. Goldcorp maintains they've managed elevated selenium concentrations within the confines of their property and continue to monitor an operate their tailings management system to prevent any external impacts. The company notes they are taking the issue seriously and implementing the necessary measures to resolve. ***While not conclusive and apparently under investigation by Mexican authorities, the issue poses risk of potential environmental fines and remediation costs, though amounts, if any are indeterminate at this point.***

(Emphasis added.)

### B. Community Outrage Ensues

83. In response to the Reuters Report, the communities surrounding the Peñasquito mine expressed collective outrage and indicated that public disclosure of the selenium leaks confirmed what they had been observing. This community response raised the risk that the Mexican government would be prompted to take action against Peñasquito's operations, or that collective action would disrupt those operations.

84. On September 9, 2016, Reuters published an article in Spanish titled, "Minera Peñasquito está envenenando a zacatecanos con selenio." The article quotes representatives of various community groups. Below is a translated version:

> This has been taken from the news report published a few hours ago by the International News Agency REUTERS, to the effect that the Peñasquito Mine, which belongs to the Canadian transnational company Goldcorp and established since 2008 in the municipality of Mazapil, has concealed for three years the high levels of contamination of selenium and other metals. The Coordinadora Nacional Plan de Ayala (CNPA) demands an international investigation of not only the company but also the federal agencies in Mexico, as it is clear that there is conspiracy and corruption because the regulations established by the Environmental Law have not been complied with.
>
> Felipe Pinedo Hernández, on behalf of CNPA and the Frente Popular de Lucha de Zacatecas (FPLZ) stated that there is a historic conspiracy between the transnational and its subsidiaries in Mexico and the Secretaría de Medio Ambiente y Recursos Naturales (SEMARNAT), the Procuraduría Federal de Protección al Ambiente (PROFEPA), and other agencies in charge of regulating the environment.
>
> ***"We have always been correct to denounce this form of exploitation because Peñasquito has been contaminating the waters for many years not only with selenium but also with arsenic, mercury, and fluoride,***

> ***which means that the method used in their processes of leaching has exceeded the permissible limits and is killing people," he reiterated.***
>
> ***As a result of that, there have been various health problems, such as the loss of hair, nails and teeth amid the population in the region, as well as severe damages to the thyroid gland and immunological system and damage to the duodenum, the digestive system, the liver and the lungs, all caused by selenosis and chronic ingestion.***
>
> Pinedo Hernández asserted that these are the consequences from the exploitation of open-pit mining that has been always been concealed because selenium is dangerous in high levels and can cause permanent health damages.
>
> ***He confirmed that the contamination has expanded to the groundwater layers, especially those located near the waste dame in the communities of Cerro Gordo, Cedros, Matamoros and El Vergel, which surround the mine and circumscribe the water with a heightened contaminating risk.***
>
> For that reason, it is demanded that a thorough investigation of the mine and the agencies of environmental protection. That should be carried out in accordance with many international agreements to prevent contamination, such as the Organización de Cooperación y el Desarrollo Económico (OCDE) and the Group de Trabajo de la Mesa del Atlántico Norte, among others.
>
> Thus, Felipe Pinedo warned that in the worst case scenario, failing to undertake radical intentional measures will result in the massive death of people of the communities in the semi-desert in Zacatecas.
>
> "We hold the company responsible for the waste that flows into the collapse of complete danger of the population's death, for the principal source of contamination caused by the mistaken methods of exploitation of heavy and dangerous metals which contaminate the fossilized waters in the region," warned Felipe Pinedo.
>
> ***Finally, he made it clear that CNPA demanded that indemnification and compliance in order to litigate regarding the environmental impact and that the communities be informed because it is not possible that only after three years information about the heightened contamination risk and severe damages to the residents surfaces , and thus generating a many-times more negative and tragic effect.***

(Emphasis added.)

85. On September 22, 2016, *La Jornada*, a Mexican newspaper, published an article titled, "Campesinos de Mazapil denuncian contaminación de mantos freáticos." Below is a translated version:

> Farmers from the municipality of Mazapil, Zacatecas, during the protest that was carried out yesterday in front of the principal access to the mine Peñasquito, affiliated with the Canadian company Goldcorp.

> Dozens of farmers from the municipality of Mazail protested in front of the principal access to Goldcorp's open-pit gold mine Peñasquito, 315 kilometers northeast of the capital, to demand that they stop contaminating the underground water systems with selenium and other chemical elements.
>
> ***They announced that on October 1 the Frente Común de Afectados por la Minera Peñasquito (FCAM) is to be constituted, in which farmers from 20 communities surrounding the mining complex will participate. Farmers claim that because of the contamination they have seen children with skin conditions, high-risk pregnancies (27 separate cases have been identified), and loss of sight.***
>
> ***Felipe Pinedo Hernández, spokesperson for the Frente Popular de Lucha de Zacatecas [Front of Communities Affected by Peñasquito Mine] (FPLZ), an organization that advises farmers, informed that the protests in front of the mining complex was to complain to the executives for continuing to operate in conditions that threaten life, hurt people's health, and deprive the residents of their rightful access to water.***
>
> The leader stated that Goldcorp had made commitments to the residents of the common lands of Cedros, El Vergel, Cerro Gordo, Las Palmas, Matamoros, Ciénega, and Tecolotes, many of which have ceased to farm their lands while receiving no benefit from the mining corporation.
>
> ***He said that the mine Peñasquito continues to damage the health of the residents with contaminated water and very soon will displace families from at least four communities, because it has contaminated not only the groundwater systems in Mazapil, but also the subterranean as well as surface-level waters.***
>
> The company disposes of mining waste that contains heavy metals and toxic chemicals like lead, selenium, arsenic, cadmium, and cyanide, which have caused skin-related diseases amid the population, especially among children, in addition to the 27 registered cases of high risk pregnancies.
>
> Contamination is set to escape the groundwater systems in Mazapil to reach subterranean and surface-level waters.
>
> Farmers disclosed that Goldcorp has failed to comply with an agreement that had been reached with the farmers at the beginning of 2016, an agreement that consists of 19 items, of which stand out the perforation of water wells for human drinking, compensations for damaged lands, and direct and indirect employment for residents in the area.
>
> The Frente de Comunidades Afectadas por la Minería added that it will endeavor to ensure that the Canadian company fulfills each of their demands.

(Emphasis added.)

**C. The Blockade and Controlled Shutdown of the Peñasquito Mine**

86. On September 26, 2016, protesters began blocking access to the Peñasquito mine. As the blockade continued and supplies dwindled, on October 3, 2016, Goldcorp issued a press release announcing a controlled shutdown of operations at the Peñasquito mine until the blockade ended.

87. Goldcorp's press release made it appear that the blockade was merely a contractual dispute involving truck drivers. But, as the articles in the Mexican press demonstrate, that was not the case. As a *Globe and Mail* article titled "Goldcorp shuts Mexico gold mine after week-long blockade," published on October 3, 2016, reported: "The miner said the blockade was illegal and caused by a trucking contractor concerned about losing business due to efficiency improvements at the mine. . . One of the protest leaders, Felipe Pinedo said last week that landowners were also part of the blockade and that protesters' demands include payment for environmental damages, jobs, and water for their communities."

88. On October 3, 2016, an analyst report issued by Desjardins Capital Markets stated that:

> Penasquito represents 40.7% of our NAV and 19.9% of our 4Q16 gold production estimate (24.9% of 2015 gold production); however, it also generates a significant amount of silver, lead and zinc byproducts so on a gold-equivalent-ounce (GEO) basis, it accounts for 33.3% of our 4Q16 estimate. ***Earlier this year, the company performed the first site-wide shutdown of Penasquito and the restart proved to be somewhat challenging; we thus view this as a potential risk for 4Q16 when the blockade might be resolved and the mine and mill restarted.*** Overall, we view this morning's news as a modest negative.

(Emphasis added.)

89. In response to this news, on October 3, 2016, Goldcorp's stock price fell another $0.74, or approximately 5% from its previous closing price, to close at $15.78 per share.

90. On October 8, 2016, Goldcorp announced that it had reached an agreement with protesters to lift the blockade. Goldcorp promised to renew contracts with carriers, expand and establish two health centers, improve infrastructure in nearby city, and

study water and air to assess whether it should compensate communities for contamination.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. 2013 Annual Report

91. On March 31, 2014, Goldcorp filed with the SEC its 2013 annual report on Form 40-F, which was signed and/or certified by Defendants Jeannes and Hall. The filing contains several statements concerning Goldcorp's compliance with regulations and its internal Sustainability Policy (any emphasis added):

a. "While ***appropriate steps are taken to prevent discharges of pollutants into the ground water and the environment***, Goldcorp may become subject to liability for hazards that it may not be insured against."

b. To implement the Sustainability Policy, Goldcorp would, among other things: (i) "Design, construct, operate and close the Corporation's facilities to comply with applicable local regulations and laws and to meet international guidelines; (ii) "Promote the development and implementation of effective systems to minimize risks to health, safety and the environment"; and (iii) "Communicate openly with employees, local stakeholders and governments on the Corporation's plans, programs and performance."

c. "Although ***Goldcorp's mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations***, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail production or development."

d. "This increase in water production combined with ***rigorous control of tailings management*** and improved efficiencies in the primary crusher and augmented feed circuit, allowed an increase in plant throughput from 99,945 tonnes per day in 2012 to 106,200 tonnes per day in 2013."

92. The above statements were materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform regulators or the surrounding community; (iii) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (iv) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**B. 2014 First Quarter Report**

93. On May 1, 2014, Goldcorp filed with the SEC its 2014 first quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

94. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had

suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform regulators or the surrounding community; (iii) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (iv) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**C. 2014 Second Quarter Report**

95. On July 31, 2014, Goldcorp filed with the SEC its 2014 second quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

96. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform regulators or the

surrounding community; (iii) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (iv) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**D. 2014 Denver Gold Forum**

97. On September 16, 2014, Defendant Jeannes attended the Denver Gold Forum, where he said the following:

> ***Peñasquito in Mexico. I'm happy to report that the mine continues to perform very well, mine and mill.*** We're on track to grow our production this year to between 530,000 ounces and 560,000 ounces. We have the water we need to achieve that production guidance for this year and we have our Northern Well Field project, which will give us the long-term water supply for Peñasquito and that's advancing on schedule for mid-next year. ***So everything going well operationally there.*** And then we've also got some exciting studies under way at Peñasquito on our metallurgical process where they're called concentrate enrichment and pyrite leach projects. Both of these are going to be completed, pre-feasibility studies around year-end. So look for news in the new year, but we think there's real opportunity to improve the economics at Peñasquito.

(Emphasis added.)

98. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform regulators or the surrounding community; (iii) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (iv) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational

harm, and legal liability in connection with its most important mine and source of revenue.

**E. 2014 Third Quarter Report**

99. On October 30, 2014, Goldcorp filed with the SEC its 2014 third quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

100. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem; (iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**F. 2014 Annual Report**

101. On March 18, 2015, Goldcorp filed with the SEC its 2014 annual report on Form 40-F, which was signed and/or certified by Defendants Jeannes and Hall. The filing contains several statements concerning Goldcorp's compliance with regulations and its internal Sustainability Policy (any emphasis added):

a. "While ***appropriate steps are taken to prevent discharges of pollutants into the ground water and the environment***, Goldcorp may become subject to liability for hazards that it may not be insured against."

b. To implement the Sustainability Policy, Goldcorp would, among other things: (i) "Design, construct, operate and close the Corporation's facilities to comply with applicable local regulations and laws and to meet international guidelines; (ii) "Promote the development and implementation of effective systems to minimize risks to health, safety and the environment"; and (iii) "Communicate openly with employees, local stakeholders and governments on the Corporation's plans, programs and performance."

c. "Although ***Goldcorp's mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations***, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail production or development."

d. "Mining and milling operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas which may result in environmental pollution and consequent liability. Although appropriate precautions to mitigate these risks are taken, these risks cannot be eliminated."

102. The above statements were materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings

dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem; (iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**G. 2015 First Quarter Report**

103. On April 30, 2015, Goldcorp filed with the SEC its 2015 first quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

104. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem;

(iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**H. 2015 Second Quarter Report**

105. On July 30, 2015, Goldcorp filed with the SEC its 2015 second quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

106. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem; (iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened

regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**I. 2015 Third Quarter Report**

107. On October 29, 2015, Goldcorp filed with the SEC its 2015 third quarter report on Form 6-K, which was signed and/or certified by Defendants Jeannes and Hall. With respect to the environment and sustainability, the filing stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests, fines and penalties.*** The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

(Emphasis added.)

108. The above statement was materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem; (iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

**J. 2015 Annual Report**

109. On March 30, 2016, Goldcorp filed with the SEC its 2015 annual report on Form 40-F, which was signed by Defendants Garofalo and Ball. The filing contains several statements concerning Goldcorp's compliance with regulations and its internal Sustainability Policy (any emphasis added):

a. "While ***appropriate steps are taken to prevent discharges of pollutants into the ground water and the environment***, we may become subject to liability for hazards that we may not be insured against."

b. To implement the Sustainability Policy, Goldcorp would, among other things: (i) "Design, construct, operate and close the Corporation's facilities to comply with applicable local regulations and laws and to meet international guidelines; (ii) "Promote the development and implementation of effective systems to minimize risks to health, safety and the environment"; and (iii) "Communicate openly with employees, local stakeholders and governments on the Corporation's plans, programs and performance."

c. "Although ***our mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations***, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail production or development."

d. "Mining and milling operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas which may result in environmental pollution and consequent liability. Although appropriate precautions to mitigate these risks are taken, these risks cannot be eliminated."

110. The 2015 annual report also stated the following:

> ***Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried***

> ***or other interests.*** The occurrence of these various factors and uncertainties related to the economic and political risks of operating in foreign jurisdictions cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, ***the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.***

111. The above statements were materially false or misleading, or contained a materially misleading omission, because at this time Goldcorp knew, but failed to disclose to investors, that: (i) after three years of operation, selenium levels had suddenly begun rising sharply at the Peñasquito mine as the result of a leak in its talings dam; (ii) selenium levels ultimately reached more than five times the allowable limit permitted by Mexican regulations, yet the Company failed to inform the surrounding community; (iii) the Company had informed the Mexican government of the problem; (iv) as evidenced by the Company's discovery of additional leaks and areas of contamination, the Company was unable to contain the problem; and (v) as a result, the Company was exposed to the substantial risk of regulatory sanction, heightened regulatory and political scrutiny, disruption of its operations, reputational harm, and legal liability in connection with its most important mine and source of revenue.

## VII. LOSS CAUSATION

112. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Goldcorp common stock and operated as a fraud or deceit on investors by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Goldcorp common stock fell significantly as the prior artificial inflation dissipated. As a result of their purchases of Goldcorp common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

113. By failing to disclose to investors the adverse facts detailed herein during the Class Period, Defendants presented a misleading picture of Goldcorp's business and prospects. Defendants' materially false and misleading statements and omissions caused Goldcorp common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $29.25 per share on August 13, 2014, before falling to $15.78 per share on October 3, 2014, the last day of the Class Period.

114. Defendants' material misrepresentations omissions and fraudulent conduct concealed the selenium leaks at the Peñasquito mine tailings dam. Goldcorp's public statements during the Class Period did not disclose that the Company was vulnerable to negative consequences arising from that leak. As alleged above, on August 24, 2016 and October 3, 2016, these risks ultimately materialized. On those dates, new information was disseminated to the market that caused Goldcorp's stock price to fall, resulting in damages to Lead Plaintiffs and other members of the Class. The materialization of these risks is evidenced by the fact that the truth ultimately came to light and caused a decline in the price of Goldcorp common stock.

115. The significant decline in the price of Goldcorp common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The economic losses suffered by Lead Plaintiffs and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Goldcorp common stock and the subsequent significant decline in the value of the security when Defendants' prior material misrepresentations and omissions and other fraudulent conduct were publicly revealed.

## VIII. PRESUMPTION OF RELIANCE

116. Lead Plaintiffs and members of the Class are entitled to rely on the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Goldcorp common stock traded in an efficient market;

d. the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Goldcorp common stock; and

e. without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and other members of the Class purchased or otherwise acquired Goldcorp common stock between the time that Defendants made material misrepresentations and omissions and the time the concealed risks materialized or the true facts were disclosed.

117. At all relevant times, the market for Goldcorp common stock was open and efficient for the following reasons, among others:

a. Goldcorp regularly communicated with public investors via established market communications mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as securities analysts, and other similar reporting services; and

b. Goldcorp was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace.

118. Goldcorp common stock met all of the requirements for trading and were actively traded on the highly efficient NYSE under the ticker symbols “GG.”

119. As a result of the foregoing, the market for Goldcorp common stock promptly digested current information regarding the Company from all publicly available sources, and the prices of Goldcorp common stock reflected such information.

120. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Goldcorp common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and the other members of the Class

purchased or otherwise acquired Goldcorp common stock relying upon the integrity of the market price of the security and other market information relating to Goldcorp. Under these circumstances, all purchasers of Goldcorp common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

121. Further, at all relevant times, Lead Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by the law and in Goldcorp's publicly available financial reports. Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired Goldcorp common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

122. The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

123. None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

124. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these

statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

125. Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Goldcorp who knew that the forward-looking statement was false.

## X. CLASS ACTION ALLEGATIONS

126. Lead Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period (March 31, 2014 through October 3, 2016), purchased or otherwise acquired Goldcorp securities and were damaged thereby. Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, member of the Board of Management, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

127. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of the proposed Class. At the end of the Class Period, Goldcorp common stock was held by

thousands of persons and actively traded on the NYSE. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Record owners and other members of the Class may be identified from records maintained by Goldcorp or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques of notice similar to that customarily used in class actions arising under the federal securities laws.

128. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

a. whether Defendants' actions as alleged herein violated the federal securities laws;

b. whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

c. whether Defendants knew or were deliberately reckless in not knowing that their statements were false and/or misleading;

d. whether and to what extent the market prices of Goldcorp common stock were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

e. whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of any such damages.

129. Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired Goldcorp common stock during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class action securities litigation to further ensure such

protection, and intends to prosecute this action vigorously. Lead Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

130. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for individual Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

**Asserted Against All Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder**

131. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class against Goldcorp and the Individual Defendants.

132. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, regarding the intrinsic value of Goldcorp common stock, as alleged herein; (ii) artificially inflate the price of Goldcorp common stock, and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Goldcorp common stock at artificially inflated prices that did not reflect their true value. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

133. Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Goldcorp common stock in an effort to maintain the artificially inflated price of Goldcorp common stock in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

134. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Goldcorp's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants did not have a reasonable basis for their alleged false statements and engaged in practices, and a course of business which operated as a fraud and deceit upon the purchasers of Goldcorp common stock during the Class Period.

135. Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in Goldcorp's public filings and reports and investor conferences.

136. Defendants are further liable for the false and misleading statements made by Goldcorp's officers, management, and agents in the Company's public filings and reports and investor conferences, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

137. Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, and without a reasonable basis, for the

purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Goldcorp common stock. By concealing material facts from investors, Defendants maintained the Company's artificially inflated stock prices throughout the Class Period.

138. In ignorance of the fact that the price of Goldcorp common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to or with deliberate recklessness disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Goldcorp common stock during the Class Period at artificially inflated prices and were damaged when that artificial inflation was removed from the price of Goldcorp common stock.

139. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs, the other members of the Class, and the marketplace known the truth concerning the Company's conduct and the intrinsic value of Goldcorp common stock, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Goldcorp common stock, or, if they had purchased or otherwise acquired their Goldcorp common stock during the Class Period, they would not have done so at artificially inflated prices.

140. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

141. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Goldcorp common stock during the Class Period.

## COUNT II

### Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

142. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and all other members of the Class against the Individual Defendants.

143. Defendant Jeannes served as the CEO and President of Goldcorp from January 1, 2009 through February 29, 2016; Defendant Hall served as CFO of Goldcorp from April 19, 2006 through March 9, 2016; Defendant Garofalo has been the President and CEO of Goldcorp since February 29, 2016; and Defendant Ball has been CFO of Goldcorp since March 9, 2016. As such, the Individual Defendants had regular access to non-public information about Goldcorp's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

144. The Individual Defendants acted as controlling persons of Goldcorp within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Goldcorp's day-to-day operations, and/or knowledge of statements made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiffs allege were materially false and misleading at the time they were made.

145. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, public filings, and other statements alleged by Lead

Plaintiffs to have been materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

146. In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of Goldcorp and, therefore, are presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

147. As set forth above, Goldcorp and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Goldcorp common stock during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. awarding Lead Plaintiffs and the members of the Class damages and interest thereon;

C. awarding Lead Plaintiffs' and the Class's reasonable costs, including attorneys' and experts' fees; and

D. awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIII. JURY DEMAND

Lead Plaintiffs demand a trial by jury of all issues so triable.

DATED: December 22, 2016

GLANCY PRONGAY & MURRAY LLP

By: *s/ Joshua L. Crowell*

Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
Lesley F. Portnoy
Jennifer Leinbach
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Lead Plaintiffs Michael Hamblett and Robert Shavelle*

Joseph P. Guglielmo
Amanda F. Lawrence
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

*Additional Attorneys for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On December 22, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 22, 2016, at Los Angeles, California.

*s/ Joshua L. Crowell*
Joshua L. Crowell

# Mailing Information for a Case 2:16-cv-06391-FMO-AFM Robert Cowan v. Goldcorp, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joshua Lon Crowell**
  jcrowell@glancylaw.com,info@glancylaw.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **John T Jasnoch**
  jjasnoch@scott-scott.com,rmcgraw@scott-scott.com,edewan@scott-scott.com
- **Reed R Kathrein**
  reed@hbsslaw.com
- **Jennifer M Leinbach**
  Jleinbach@glancylaw.com
- **Adam C McCall**
  amccall@zlk.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`